FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAY 3 1 2016

JAMES N. HATTEN, CLERK
By:
Deputy Clerk
J. Brannon

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| MARIE L. HENRY | ) | |
| | ) | CIVIL CASE NO.: |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| EXAMWORKS INC. | ) | **1: 16-CV-1751** |
| EXAMWORKS CLINICAL SOLUTIONS LLC. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S TITLE VII COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff MARIE L. HENRY, (hereinafter, Plaintiff or HENRY) appearing *pro se* hereby sues ExamWorks Inc. and ExamWorks Clinical Solutions LLC hereinafter ("Defendants" or "EXAMWORKS"), a Delaware Corporation, and alleges:

**I.    INTRODUCTION**

1).         The facts and history of this case are convoluted and transpired over a six year period. This is an action to vindicate violations of the HENRY'S civil rights and to redress the unlawful and discriminatory conduct and employment practices of the Defendants.   Plaintiff was denied sick leave, subjected to harassment, retaliation and denied terms and conditions of employment such as: (leave authorized by the Family Medical Leave Act (FMLA), health insurance, and accrued paid time off (PTO)).  This action arises out of the unlawful and wrongful discharge of Plaintiff on or about April 23, 2015.  The evidence shows that the Defendants unlawfully penalized and discriminated against Plaintiff for lawful protected activities.  As a pre-textual justification for HENRY'S termination, some of the Defendants' allegations include, but are not limited to:

(a).    the unlawful arrest of HENRY'S minor child;

(b).    a citizen's complaints that HENRY filed against arresting officers;

1

(c).    an ethics complaint HENRY filed against the state prosecutor;

(d).    a motion for disqualification HENRY filed against the judge; and

(e).    a grievance HENRY filed against members of the Florida Bar for unlawful harassment and disparate treatment.

2).    Plaintiff was terminated from her employment based, in whole or in part, upon her race, gender, age, disability and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 2000e et seq., and the Civil Rights Act of 1866, as amended by the Civil Rights Restoration Act of 1991, 42 U.S.C. Section 1981.

## II.    **PARTIES**

3).    At all times material hereto, Plaintiff, is a black female citizen of the United States, and a resident of the state of Florida.  Plaintiff was employed by Gould & Lamb LLC as Staff Counsel on April 11, 2011.  She worked as a remote employee from her home in Sorrento, Florida. She served internal and external clients in a geographically dispersed territory covering most of the continental United States, Alaska and Hawaii.

4).    At all times material hereto, ExamWorks, Inc. was and is a corporation organized under the laws of Delaware doing business in Florida and throughout the various states.  Plaintiff is informed and believes:

i.      ExamWorks Inc. is a multinational corporation with offices in New York, and service centers throughout the United States, Canada, the United Kingdom and Australia. The corporate headquarters are located at 3280 Peachtree Road NE, Suite 2625 Atlanta, GA 30305;

ii.     On February 2, 2014, ExamWorks Inc. purchased Gould & Lamb LLC, a company organized under the laws of Florida with its headquarters at 101 Riverfront Blvd. Suite 100 Bradenton, FL 34205.

iii.    As of December 31, 2014, all of Gould & Lamb LLC employees and its operations were absorbed under the umbrella of ExamWorks Inc. family of corporations, as ExamWorks Clinical Solutions LLC. ExamWorks Clinical Solutions LLC is a wholly owned subsidiary of Defendant ExamWorks Inc. ExamWorks Clinical Solutions LLC headquarters is located at 2397 Huntcrest Way, Suite 200 Lawrenceville, GA 30043. ExamWorks Inc. and ExamWorks Clinical Solutions LLC share common ownership, fringe benefits, and employment policies, such that it is not feasible to name one

2

corporation without other.

## II.   **JURISDICTION AND VENUE**

5).      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1337 and 42 U.S.C. §2000e-5(f).  Plaintiff invokes this Court's supplemental and pendant jurisdiction over all of Plaintiff's state law claims, if any, which arise out of the same nucleus of operative facts as the federal claims alleged herein.

6).      Venue is proper in this Court under 28 U.S.C. §1331(b) because EXAMWORKS is headquartered in Atlanta, GA and the events or omissions giving rise to the claims occurred in this district.

7).      At all times material, Defendants employed more than fifteen (15) persons, and therefore was and is an "employer" as that term is defined in Title VII of the Civil Rights Act., 42 U.S.C. 2000e § 701(b), and under Americans with Disabilities Act (ADA), as amended.

8).      Plaintiff is an "aggrieved person," because she filed a complaint with the EEOC.

## III.   **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

9).      On July 21, 2015, Plaintiff timely filed her Charge of Discrimination with the Miami, Florida office of the Equal Employment Opportunity Commission (EEOC).  Plaintiff asserted that her termination was motivated by illegal discrimination on the basis of race, age, disability, and retaliatory acts for filing discrimination complaints or opposing practices made unlawful under federal and state law.  The EEOC transferred Plaintiff's charge of discrimination to the EEOC Atlanta District Office.

10).     Plaintiff received from the Atlanta District Office a Notice of Right to Sue, on March 3, 2016.  A copy of the right to sue notice is attached hereto and marked as **(Exhibit 1)**.

11).     Plaintiff has complied with all conditions precedent prior to bringing this action.

3

III.   **FACTUAL BACKGROUND AND GENERAL ALLEGATIONS - ALL COUNTS**

12).         Plaintiff, a black female, with a statutory disability under the ADA, as amended, honorably discharged service member, earned her Juris Doctor degree at Barry University Dwayne Andreas College of Law on January 17, 2009. She graduated number 8 in a class of 33. Currently, she owes more than a $124,000.00 in federal student loans that were procured in pursuit of her law degree. She took and passed the Florida Bar Exam administered by the Florida Board of Bar Examiners (FBBE) on February 24 - 25, 2009. She also passed the Model Professional Responsibility Exam (MPRE), as required, for admission to the Florida Bar. She underwent an extensive character and fitness investigation by the FBBE. She passed the FBBE investigation without further inquiry and was admitted to the Florida Bar April 24, 2009. Plaintiff's membership in the Florida Bar, is mandatory in order to hold a license to practice law. The Florida Bar has 102,765 members.[1]

13).         The purpose of the Florida Bar is enshrined in the Rule Regulating the Florida Bar, 1-2 hereinafter RRTFB as follows: *"shall be to inculcate in its members the principles of duty and service to the public, to improve the administration of justice, and to advance the science of jurisprudence."*

14).         The **duty to report misconduct** is one of the ethical duties imposed on attorneys in every jurisdiction, in the United States, including Florida (RRTFB 4-8.3). An attorney who becomes aware that either a fellow attorney or a judge has committed an act in violation of the rules of ethical conduct must report that violation. The failure to do so is itself a violation of the RRTFB.

15).         The jurisdiction to regulate Florida licensed attorneys is delegated to the Florida Bar by the Florida Supreme Court. The jurisdiction is derived from the state's police power pursuant to

---

[1]https://www.floridabar.org/tfb/flabarwe.nsf/f6301f4d554d40a385256a4f006e6566/47fc0a8f415a11d285256b2f006ccb83 (last visited 5/20/2016).

4

art. V §15 Fla. Const. and provides: *"Attorneys; admission and discipline.—The supreme court shall have exclusive jurisdiction to regulate the admission of persons to the practice of law and the discipline of persons admitted."*

16).         Attorney regulation involve important constitutional, property and penal interests. These interests require minimum safeguards and standards including due process, notice, and opportunity to be heard.  Bar proceedings require a clear and convincing standard (*Florida Bar v. Rayman*, 238 So.2d 594, 596-7 (Fla. 1970)).  The United States Supreme Court said that the higher intermediate standard of clear and convincing standard is reserved for cases *"where particularly important individual interests or rights are at stake."*(*Herman & McLean v. Huddleston*, 9 U.S. 375, 389-90 (1983)).

17).         Federal jurisprudence and Florida law have set jurisdictional predicates that should have ensured that Plaintiff was not unlawfully deprived of the property interest in her law license. As examples:

A.     Florida Statute § 454.11 provides: *"All attorneys shall be deemed officers of the court for the administration of justice, and amenable to the rules and discipline of the court in all matters of order or procedure* <u>*not in conflict with the constitution or laws of this state*</u>*."*

B.     It is unlawful for a state to violate an attorney's First Amendment rights under the guise of attorney discipline.  The U.S. Supreme Court found that the abridgement of the freedoms of the First Amendment that are protected against state action by the Fourteenth Amendment is unlawful.  The Court states in pertinent part: *"[T]hese freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions.*[2]

C.     Florida Statute § 216.011(6) Public Ethics Act states in pertinent part: *"It is declared to be the policy of the state that public officers and employees, state and local, are agents of the people and hold their positions for the benefit of the public. They are bound to uphold the Constitution of the United States and the State Constitution and to perform efficiently and faithfully their duties under the laws of the federal, state, and local governments."*

---

[2] NAACP v. Button, 371 U.S. 415, 433 (1963)

5

18).        Prior to her employment with EXAMWORKS Plaintiff had an exemplary career in the financial services industry for more than twenty years.  Beginning on or about April 11, 20111, Plaintiff was employed at Gould & Lamb LLC as Staff Counsel.  Plaintiff believes that she was the first and only black attorney ever employed by EXAMWORKS or its predecessor company Gould & Lamb LLC.   During her tenure with Gould & Lamb and EXAMWORKS, Plaintiff contributed positively to the company's bottom line, worked with diligence to perform her duties in a professional and exemplary manner. Plaintiff earned praises and accolades from her colleagues, management, as well as from internal and external clients.

19).        As a Staff Counsel, Plaintiff is a credentialed Medicare Expert and was engaged primarily in consulting with first party insurers, attorneys, municipalities, third party administrators, adjusters, risk managers and other stake holders on matters involving compliance with the Medicare Secondary Payer Act and other derivative federal laws.  Plaintiff also served as a resource for the Defendants' geographically dispersed work force. She attended and spoke at industry conferences, and worked with federal agencies to resolve liens on behalf of the Defendants' clients.

20).        EXAMWORKS is not a law firm and the work Plaintiff performed did not involve dispensing legal advice.  At all times material to this complaint, Plaintiff is a mandatory member of the Florida Bar.

21).        On April 2, 2015, Plaintiff's health care provider, Jennifer Davis, restricted her work activities based on medical necessity and referred her to a specialist.  On April 10, 2015, Plaintiff was referred to Lisa Pugh, in EXAMWORKS Human Resources Department and she requested a leave of absence pursuant to the Family Medical Leave Act, hereinafter FMLA.

22).        On Friday April 17, 2015, Plaintiff participated in a company meeting where she was asked to attend an upcoming industry conference in New Orleans, LA.  As a result of the meeting, Plaintiff decided to discuss her medical condition and pending leave with her immediate supervisor, Russell Whittle, hereinafter WHITTLE.

23). WHITTLE, an EXAMWORKS, executive level employee, is a member of the Florida Bar and has been Plaintiff's immediate supervisor during her entire tenure of employment. On Monday, April 20, 2017, Plaintiff discussed at length her upcoming medical leave, and the medical necessity for that leave.

24). Plaintiff also informed WHITTLE, (for the first time), that she had lost her group health insurance for the year 2015 because she was traveling on business during the open enrollment period which was accessible from Friday, December 5, 2014 – Thursday, December 11, 2014. She informed him that she had reached out to the Human Resources Department on December 12, 2014, after she attempted to enroll in the group insurance plan and could not. She informed him that she was referred to EXAMWORKS, Executive Vice President, Crystal Patmore, hereinafter PATMORE. Over a series of emails between PATMORE and HENRY, her request to be enrolled in the company's group health coverage for 2015 was denied.

25). Plaintiff specifically informed WHITTLE that she believed PATMORE'S decision not to provide her with health care coverage prevented her from getting necessary medical treatment which resulted in the deterioration of Plaintiff's health. She also informed WHITTLE that some of her medical symptoms were aggravated by her job which required extensive computer work including typing, using the mouse, and sitting at the computer with her neck in a forward flexed position for extended periods of time.

26). Additionally, Plaintiff informed WHITTLE of developments with the Florida Bar stemming from complaints she filed regarding the unlawful arrest of her juvenile daughter on October 31, 2009. WHITTLE was aware that PLAINTIFF'S juvenile daughter was arrested on Halloween night 2009 because she did not immediately provide her name to a white police officer who stopped a group of minority kids, accused them of criminal mischief and demanded their names for his database. Plaintiff shared this information with WHITTLE Fall 2012 when she first became aware that the Florida Bar opened an investigation against Plaintiff. The investigation emanated from

7

an ethics complaint against a Florida Bar member who prosecuted her child without probable cause; and a motion to disqualify the judge who presided over her child's juvenile case.  Facts relating to the ethics complaint and motion are more fully alleged *infra.* ¶ 44 (1-3).

27).        Plaintiff also informed WHITTLE of some of the details involving actions of the employees/volunteers of the Florida Bar who threatened Plaintiff with punishment and accused her of "playing the race card."  It is unlawful to make accusations of "playing the race card" against Plaintiff who is black and a victim of police and prosecutorial misconduct.  Threats against the Plaintiff for asserting her rights are retaliatory, against her penal interests and are unlawful.

28).        Plaintiff informed her boss, WHITTLE, that it was no coincidence that on the same day she filed a notice of appeal to the Eleventh Circuit involving her daughter's Section 1983 lawsuit filed against the City of Mount Dora and its' officers that her license was suspended without elaboration of any facts or law supporting the suspension.  She informed him that she was particularly troubled by the timing of the suspension as it was evident that no matter what the law says she would be denied her rights.  She discussed the Florida Bar's Order, that she was "*mentally unfit to practice law*" as being false and stigmatic.

29).        She informed WHITTLE of her overwhelming concerns that members of the Florida Bar were permitted to engineer a prosecution against her, manufacture evidence and use the power of public office to harass and intimate her.  Plaintiff expressed her sense of injustice that white members of the Florida Bar had engaged in a systematic pattern of selectively prosecuting her without probable cause.  She expressed that she was singled out because she stood up for her rights and her child's rights.  WHITTLE voiced his understanding and commented that "they are vindictive."

30).        Plaintiff then made specific comments to WHITTLE that the actions taken by the Florida Bar, the prosecutor, the judge and the police officers who arrested her child were reminiscent of the actions under review by the national media and the Department of Justice concerning race, the

police and injustices carried out in places like Ferguson, MO.

31).     Plaintiff is informed and believes and on that basis alleges that prior to her termination, WHITTLE was fully aware that the only basis ever identified by the Florida Bar for prosecuting Plaintiff were tainted with retaliation and racial animus for engaging in protected activities.  One example occurred on October 15, 2012, when the Florida Bar Prosecutor said in an email: "*She is accusing the judge and the prosecutor of inappropriate conduct because of the race of her daughter - she needs to prove it and the best way to do so is to let me read the transcripts - I believe it is incumbent upon her to get them to me.*"  Next, on October 23, 2013, Plaintiff received an email with a plea offer of a public reprimand.  The basis of the plea offer contained allegations that Plaintiff called the judge a racist and was viewed similarly to other cases where an attorney went too far in a motion to disqualify.  WHITTLE was aware that Plaintiff had never called the judge or anyone else a "racist" but did raise complaints of racial disparities in the criminal proceedings against her child and the Florida Bar proceedings against HENRY.

32).     WHITTLE was also aware from conversations with Plaintiff dating back to the Fall of 2012, that the juvenile case involving Plaintiff's child was concluded before her employment with EXAMWORKS or its predecessor company, Gould & Lamb LLC.  WHITTLE was aware of the deleterious effects that the unlawful arrest and subsequent unlawful prosecution had on Plaintiff's very young minor child at the tender age of 13.  In fact, WHITTLE had an opportunity to meet Plaintiff's daughter at a company function and often inquired about her wellbeing.

33).     On April 23, 2015 PATMORE and WHITTLE called Plaintiff on the phone and told her that she was terminated from her position of Staff Counsel, effective immediately.  Plaintiff was not given advance notice of the discharge decision; nor was she given any opportunity to respond prior to her separation; nor was she given any hearing on the decision to terminate her employment.  A copy of the notice of termination is appended hereto as (**Exhibit 2**).

### Plaintiff's Termination was Discriminatory and Unlawful

9

34).       Plaintiff acknowledges that the relationship between the employer and employee is presumed to be terminable at the will of either party without regard to the quality of performance of either party.   However, Title VII clearly prohibits termination based on discrimination.   Defendants' letter of termination dated April 23, 2015, demonstrates that Plaintiff was terminated for reasons proscribed by Title VII and under the ADA, as amended.

35).       The notice of termination lists the reason as: "Other – loss of required credentials." However, it is clear from the plain language of the notice of termination that it is for alleged misconduct and embarrassment to EXAMWORKS.  The Summary of Performance Deficiency section states: "*On April 20, 2015 the company was notified that Marie's law license will be suspended by the FL bar for a period of six months.  Marie's position of Staff Counsel requires that her law license be in good standing and the clients have an expectation that work performed by Staff Counsel will have a license in good standing.  Supreme Court findings could reflect negatively on the company.*"

36).       Over the entire course of Plaintiff's four plus years of employment, her job performance was ranked as excellent.   Plaintiff exceeded performance expectations in her evaluations performed by WHITTLE.  Plaintiff also contributed positively to the company's bottom-line, retained clients, obtained new clients and served in an exemplary manner.   Without a single iota of competent, substantial or objective evidence of any misconduct whatsoever, Plaintiff was terminated after she sought a medical leave of absence.

37).       Pursuant to state and federal laws, an individual is entitled to protection from improper interference with a business, professional or employment relationship.   The law is clearly established that one who interferes only out of spite, or to do injury to others, or for other bad motive, has no justification and the interference is improper.  Further, one who uses misrepresentations, threats of illegal conduct, and engages in the violations of rights, privileges or immunities protected by the federal or state constitutions or state or federal law has no privilege to use those methods.

EXAMWORKS joined forces with the Florida Bar, a mandatory membership organization. In a First Amendment case, involving a mandatory state bar and one of its members, the United States Supreme Court said: *"[I]ts membership is composed solely of lawyers admitted to practice in the State, and its services by way of governance of the profession are essentially advisory in nature, since the ultimate responsibility of such governance is reserved by state law to the State Supreme Court.... By contrast, there is a substantial analogy between the relationship of the Bar and its members and that of unions and their members."* (*Keller v. State Bar of California*, 496 U.S. 1, 3 (1990). The objective corroborating evidence and the statements provided by EXAMWORKS, i.e. those listed *infra* at ¶ 88 show that EXAMWORKS and its managers, knew or should have known, that their actions were improper, tantamount to ongoing harassment, and constituted improper interference with Plaintiff's employment. Federal law is settled that these type of interferences are unlawful.[3]

38).         Title VII proscribes that an employer cannot use race, gender and disability or an employee's complaints of racial discrimination as a basis to terminate employment. Nor can an employer use racial stereotyping, bias or racially motivated business decisions that are driven by business concerns or negative reaction of clients. EXAMWORKS statements and actions reflect that "embarrassment" to EXAMWORKS based on Plaintiff's status as a black female employee and the false hearsay statements by white members of the Florida Bar were the motivating factors to terminate Plaintiff's employment.

### Failure to Train or Supervise or Establish Policies to Avoid Discrimination

---

[3] U.S. law enforcement officers and other officials like judges, prosecutors, and security guards have been given tremendous power by local, state, and federal government agencies—authority they must have to enforce the law and ensure justice in our country. These powers include the authority to detain and arrest suspects, to search and seize property, to bring criminal charges, to make rulings in court, and to use deadly force in certain situations. Preventing abuse of this authority, however, is equally necessary to the health of our nation's democracy. That's why it's a federal crime for anyone acting under "color of law" to willfully deprive or conspire to deprive a person of a right protected by the Constitution or U.S. law. https://www.fbi.gov/about-us/investigate/civilrights/color_of_law (last visited 5/20/2016)

11

39).    On April 23, 2015, when Plaintiff was terminated, she was still a licensed attorney and member of the Florida Bar in good standing. EXAMWORKS and its managers claim to have relied on information such as Plaintiff's Motion to Disqualify, complaints she made about race, and her child's juvenile records, to support its decision to terminate Plaintiff; deny her pay; deny her fringe benefits; and deny her disability leave. By operation of clearly established law, EXAMWORKS conduct is unlawful.

40).    The Defendant, ExamWorks Inc. is a sophisticated publically traded corporation engaged in interstate commerce and international trade. No reasonable, prudent corporation in the same or similar circumstances would have denied Plaintiff's health insurance; denied her FMLA leave; or rely on hearsay within hearsay statements from individuals against whom she: filed an ethics complaint; claimed disparate treatment; claimed harassment; and claimed discrimination, without even a scintilla of an investigation.

41).    If indeed EXAMWORKS reasonably believed that Plaintiff had performance deficiencies related to her work at EXAMWORKS or had engaged in misconduct during her employment, it had a duty to investigate and provide Plaintiff an opportunity to respond. This is because, the information on which EXAMWORKS said it relied, implicates Plaintiff's and her child's race and is tainted with retaliation. There is no reasonable justification for EXAMWORKS' unlawful conduct.

42).    The verbal and written statements of the Defendants' employees PATMORE, WHITTLE and other unknown executives or managers, that were provided to third parties, such as the EEOC, regarding Plaintiff are simply false. The following facts demonstrate that the Defendants and their managers exercised deliberate indifference and a willingness to bend the truth in order to accomplish its unlawful singular purpose of terminating Plaintiff based on a pre-text of misconduct and license suspension. The facts include but are not limited to:

A. Contrary to EXAMWORKS assertions, that it relied on the findings of the Florida Supreme

12

Court to justify Plaintiff's termination, the Florida Supreme Court has never issued any "findings of facts or conclusions of law" in response to Plaintiff's Petition for review pursuant to RRTFB 3-7.7, which provides a right of review. Plaintiff timely raised her issues of due process violations and the erroneous unlawful or unjustified findings by the Referee. As such, a *de novo* review is required. No such review was issued by the Florida Supreme Court. The Supreme Court is the supervising state agency of the Florida Bar. The Supreme Court does not act under its jurisdiction as a State Court derived from art. V. § (b)(1-10) Fla. Const. in attorney discipline matters. The Supreme Court loosely supervises the Florida Bar under the police power of art. V § 15 Fla. Const. EXAMWORKS states it relied on the Report of the Referee and references it on multiple occasions as a justification for its treatment of Plaintiff. EXAMWORKS could not justifiably rely on the Report of Referee, containing deliberate violations of the law and Plaintiff's rights. The Report show that the Referee convicted Plaintiff of: (a). alleged complaints regarding race-black; (b). alleged protected speech; and (c). imputing the unlawful conduct of public officials toward Plaintiff. Specifically, EXAMWORKS managers terminated Plaintiff using a Report of Referee with statements that Plaintiff "lied by omission" in her motion to disqualify and committed egregious violations of the Rules Regulating the Florida Bar simply because she filed a grievance with the Florida Bar complaining of harassment and disparate treatment due to her race—black. The lack of *de novo* review is a violation of Plaintiff's Due Process Rights under the Fourteenth Amendment and is detrimental to the fair and impartial administration of justice in violation of Rules Regulating the Florida Bar 4-8.4(d). EXAMWORKS and its managers could not justifiably rely on the information on which they claimed to have relied to support its claim of neutral and non-discriminatory reasons for its adverse employment actions.

B. The Defendants' and their managers claim that Plaintiff was terminated for loss of credentials. In light of the Defendants' own prior experiences with the Florida Bar, there was a heightened duty for training and supervising its managers prior to using hearsay within hearsay statements of the Florida Bar to take such drastic actions against Plaintiff. WHITTLE, PATMORE and managers or executives, of Defendants, knew that in 2013 Gould & Lamb had to defend against unsubstantiated accusations by the Florida Bar that the company was engaged in the unlicensed practice of law ("UPL"). Under Florida law, UPL is a third degree **felony** punishable by up to 5 years in imprisonment. (F.S. § 454.23).

C. Plaintiff was instrumental in helping Gould & Lamb to refute the Florida Bar's investigation for UPL. Through Plaintiff's efforts and the efforts of WHITTLE, other Staff Counsel and management, the Florida Bar's Subpoena Duces Tecum was successfully quashed. Circuit Judge Andrew D. Owens, Jr. Order dated June 28, 2013 (**Exhibit 3**) ruled that Gould & Lamb was not engaged in the practice of law. Therefore, PATMORE and WHITTLE statements that Plaintiff was terminated because of loss of credentials is patently untrue. Additionally, their statements in the termination/counseling record that: "*and the clients have an expectation that work performed by Staff Counsel will have a license in good standing.*" is also patently false because Plaintiff could not and did not dispense legal advice to external clients. Moreover, Plaintiff's job description (**Exhibit 4**) under which Plaintiff worked for more than four years does not list a requirement of a license in good standing by the Florida Bar or any other jurisdiction.

D. As well, EXAMWORKS managers or executives stated that Plaintiff was terminated because she worked in an external-client facing role. This excuse rings hollow and evinces a mindset

13

of racially stereotyping Plaintiff. The company has employed another Florida Bar member in an external-client facing role while his license was suspended. The hearsay within hearsay allegations on which EXAMWORKS purportedly relied to terminate Plaintiff's employment are riffed with racial statements, and evidence of retaliation based on race, age, gender, and perceived disability.

43).    Defendants, managers made statements in Plaintiff's termination notice, demonstrating its full understanding that a mandatory membership organization, that is analogous to Labor Union, has the unique ability to interfere with its members' employment based on unlawful discrimination. This distinction is of such importance that the Florida Civil Rights Act specifically proscribes unlawful discrimination by such organizations. Florida Statute 760.10(5) states: *"whenever, in order to engage in a profession, occupation, or trade, it is required that a person receive a license, certification, or other credential, become a member or an associate of any club, association, or other organization."*

44).    EXAMWORKS managers made numerous statements to third parties, including those listed *infra.* at ¶ 88(A-F) to justify Plaintiff's termination. No reasonable manager with proper supervision and training would have terminated Plaintiff or deny her the terms and conditions of employment based on these statements. Because of a lack of training, or adequate policies, EXAMWORKS unreasonably denied Plaintiff her rights to Title VII protection when it allegedly terminated Plaintiff based on the facially unconstitutional deprivations of her rights. The Defendants and its managers, knew or should have known, that the Florida Bar's disciplinary proceedings emanated from three main sources, all of which are unconstitutional and unlawful:

1.    On February 23, 2012, Plaintiff filed an Ethics complaint against a public official, who unlawfully thrusted both Plaintiff and her minor child into the criminal justice system for conduct established in his circuit to be non-criminal. The child was also prosecuted after the speedy trial time-frame expired. Racial animus towards Plaintiff and her child were raised in the ethics complaint. Plaintiff exercised due diligence and filed the ethics complaint only after she consulted with the Florida Bar on whether her concerns and duty to report were grounded in objective facts. It was the Florida Bar Staff Counsel, Bill Wilhelm, who guided the Plaintiff to file the formal ethics complaint. Without investigating Plaintiff's ethics complaint, the Florida Bar gave the prosecutor, a white member of the Florida Bar, a closure letter then used Plaintiff's complaint as a basis to file disciplinary charges against Plaintiff who is

14

black.   The Bar's conduct is *Ipso Facto* retaliation proscribed by Title VII.

2.    On March 18, 2016, Plaintiff filed a motion to disqualify a judge who is a member of the Florida Bar. The motion was in a separate legal proceeding but against the same judge who presided over Plaintiff's juvenile daughter's case. The motion for disqualification and the ethics complaint emanated from the same nucleus of operative facts. The motion was not simultaneously served on the judge as required by Fla. R. Jud. Admin. 2.330(c)(4) and no decision was issued within 30 days. On 5/22/2012, Plaintiff filed a replacement disqualification motion.  On 6/19/2012, the judge issued a 7 page Disqualification Order finding both motions "**legally insufficient**" but continued in great detail to refute Plaintiff's averments with a 7 page Disqualification Order. He served the 7 page Disqualification Order on other attorneys in the lawsuit, filed it in the court's docket, circulated it to other judges in the Circuit and sent it to the Florida Bar as an Order to impose professional sanctions against Plaintiff. An unconstitutional, unlawful Disqualification Order could never lawfully become a source of discipline or interference with Plaintiff's property interest in her law license. EXAMWORKS used the Disqualification Order to justify Plaintiff's termination, denial of leave, and withholding her fringe benefits.

3.    On December 30, 2013, after consulting with the Florida Bar Ethics Hotline and the Bar's lead regulation counsel, Kenneth Lawrence Marvin, (hereinafter MARVIN). At MARVIN'S direction and approval Plaintiff wrote a detailed letter, inclusive of corroborating evidence, setting forth complaints of racial harassment, violation of rights, intimidation, threats, slander, libel, retaliation and serious improper conduct by the Florida Bar. The letter was sent <u>in confidence</u> to the Florida Bar President Eugene Pettis and Executive Director, John Harkness Jr. MARVIN assured Plaintiff that no punitive action could be taken against her for the complaints raised in her letter. The Bar's Prosecutor not only gave the letter to the Referee but identified it as "Bar Exhibit 1" during the sanctions phase of her prosecution as proof of special aggravation to suspend Plaintiff's license. Page 20 of the Report of the Referee on which the Defendants claim to have relied to terminate the Plaintiff, cites "Bar Exhibit 1" as a "major aggravating factor" warranting suspension of Plaintiff's license. EXAMWORKS knowingly used the Florida Bar Report of the Referee to terminate Plaintiff's employment, deny her leave, and withhold fringe benefits.

45).      EXAMWORKS consciously regarded Plaintiff as having inferior rights to the white members of the Florida Bar who engineered her prosecution. The numerous statements made by EXAMWORKS regarding the hearsay within hearsay statements allegedly made by members of the Florida Bar, is sufficiently particularized to show EXAMWORKS consciously disregarded the corroborating evidence which documented numerous violations of the federal or state constitutions and the Rules Regulating the Florida Bar, i.e.:

[(3-4.3 misconduct); (3-4.7, Oath); (3-7.1, confidentiality);  (3-7.3, complaint processing and initial investigatory procedures);  (4-3.1, meritorious claims and contentions); (4-3.3, candor

15

toward tribunal); (4-3.5, impartiality and decorum of tribunal); (4-3.8 special responsibilities of a prosecutor); (4-8.1, bar admission and disciplinary matters); (4-8.3, duty to report misconduct); (4-8.4, misconduct)].

46). The aforementioned conduct demonstrate a serious lack of training, and/or supervision or that EXAMWORKS policies, procedures, or training have been and continue to be deficient..

## Duty to Investigate Alleged Misconduct

47). EXAMWORKS acted in a disciplinary capacity regarding alleged hearsay within hearsay statements made by employees or volunteers of a mandatory membership organization. Therefore, EXAMWORKS had a duty to ensure that it applied an objective and impartial investigation to ensure that Plaintiff was not disciplined or terminated for something she did not do. This duty is paramount because EXAMWORKS and its managers claim that they relied on information of third parties. This third party information emanated from unconstitutional sources, implicated Plaintiff's race, and was retaliation for filing complaints and exercising protected rights.

48). In light of the employer-employee relationship, EXAMWORKS, owed a duty to Plaintiff to exercise reasonable care to prevent intentional harm to Plaintiff. There is a duty to act in situations of potential discrimination or harassment and to respect the confidentiality and reputation of all parties. Instead, the Defendants by their actions ratified, endorsed, condoned and imputed the discriminatory acts of a third party mandatory membership organization to conclude that Plaintiff's protected activities constituted misconduct in her employment relationship with EXAMWORKS. EXAMWORKS practices constitute a process and procedure that stereotyped and punished the Plaintiff because she complained that her job duties contributed to her current medical issues. Additionally, EXAMWORKS penalized the Plaintiff based upon their actions that amounted to unfair employment practices that deprived her and her family of health insurance.

16

## **Violations of Terms and Conditions of Employment and Intentional Denial of Benefits**

49).          Plaintiff enrolled in her health insurance benefits plan which covered Plaintiff and her dependent children for a coverage period from June 1, 2014 through June 1, 2015.  Plaintiff subsequently lost this health insurance coverage effective January 1, 2015 and through no fault of her own.

50).          Plaintiff escalated her concerns to Defendants' Executive Vice President, PATMORE. During several email exchanges with PATMORE, she challenged the sudden and abrupt discontinuation of her health insurance benefits as being patently unfair and in violation of the Affordable Care Act (ACA) which required all Americans to carry health insurance or pay a penalty.

51).          Plaintiff also expressed her concerns that she was actively treating for medical issues and that her children also lost their group health coverage.  PLAINTIFF posed questions as to why a full-time active employee could suddenly lose group health insurance coverage. Plaintiff raised the fact that the ACA contained an automatic enrollment provision for new and existing employees. PATMORE by reply email dated 2/4/2015 said: "*You are correct that the ACA does include a provision for automatic enrollment, but to date the implementation of this provision has been delayed by the government and is not currently a requirement of the act.*"

52).     Plaintiff was traveling on business throughout the open enrollment period.  Based on information and belief, the time offered to Plaintiff to enroll in EXAMSWORKS group health insurance plan was less than offered to other EXAMWORKS employees.  By denying Plaintiff's enrollment in its group health insurance plan, EXAMWORKS saved more than $7,100.00 (**Exhibit 5**) while subjecting Plaintiff to a federal penalty for not having health insurance as of January 1, 2015.

53).          On 4/10/2015, Plaintiff's requested a sick leave pursuant to the Family Medical Leave Act ("FMLA").  The leave was initially approved then denied.   When Plaintiff protested the denial, EXAMWORKS raised Plaintiff's termination and a lack of FMLA jurisdiction as defenses.

17

Specifically, EXAMWORKS stated that Plaintiff was a remote employee and was not entitled to coverage under the provisions of the FMLA because EXAMWORKS did not have 50 employees within a 75 mile radius of Plaintiff's residence.

54).        Plaintiff is informed and believes and on that basis alleges that at the time EXAMWORKS raised its defenses to deprive Plaintiff of FMLA leave, EXAMWORKS employed a large remote work-force and employed in excess of 3000 employees.  No other remote employee, who requested FMLA leave, was treated in this manner.  EXAMWORKS, knew or should have known, that *29 C.F.R. §825.111 provides that an employee's personal residence is not a worksite for employees who work from home or under the concept of telecommuting.*  Plaintiff's statutory rights were clearly established as she had worked the requisite number of hours to be eligible for FMLA leave.

55).        Plaintiff is informed and believes and on that basis alleges, that further evidence of unlawful discrimination exists where EXAMWORKS refused to pay Plaintiff her accrued PTO benefits totaling approximately 47.38 hours and the equivalent of almost $2500.00 (**Exhibit 6**). Other terminated white employees were not denied the benefit of their accrued PTO.

56).        The refusal to pay Plaintiff her accrued PTO benefits is consistent with the established pattern and practice of penalizing Plaintiff because she engaged in protected activities, including complaints she made to EXAMWORKS, Executive Vice President PATMORE regarding the loss of her health insurance coverage.

57).        There were no legitimate, non-discriminatory and/or non-retaliatory reasons for the discriminatory actions taken against Plaintiff by EXAMWORKS.  The negative impact of the discriminatory and retaliatory actions taken by EXAMWORKS against Plaintiff resulted in significant difficulty for Plaintiff causing extreme emotional distress that had a deleterious effect on Plaintiff's physical health and financial well-being.

58).        Plaintiff suffered an invasion of legally protected interests that is concrete and

particularized and traceable to the defendants' challenged conduct. The Defendants joined forces with third parties, acting under color of law, to violate her rights of privacies; and right to file grievances as is guaranteed by the First Amend. U.S. Const.

59). As a direct result of the forgoing conduct, Plaintiff was subjected to ridicule, shame, harassment, and grievous violations of her fundamental rights. She has been castigated, painted as a liar, and labeled mentally unfit, all under policies and practices proscribed by Title VII and other federal laws. EXAMWORKS created a culture that violated Plaintiff's rights to due process, equal protection, and her right to contract and speak freely. EXAMWORKS also violated Plaintiff's right to be rewarded for industry; and to be free from discrimination based on her race, age, gender, and disability as guaranteed by Title VII and ADA, as amended.

60). Plaintiff has suffered irreparable harm including pecuniary losses, emotional pain, embarrassment, ridicule, loss of enjoyment of life, inconvenience and other non-pecuniary losses.

## COUNT I: TITLE VII RACIAL DISCRIMINATION CLAIM
## ALL DEFENDANTS

61). Plaintiff re-alleges and incorporates by reference as if fully set forth, the allegations in paragraphs 1 through 60.

62). The acts more particularly alleged in paragraphs 12 through 60, constitute disparate treatment and show that the Defendants ratified, condoned and actively participated in racial discrimination that is specifically proscribed by Title VII.

63). EXAMWORKS unlawfully terminated Plaintiff based upon her being female and black. Defendants' employees and managers did not engage in similar conduct towards its employees who were not black.

64). EXAMWORKS deprived Plaintiff of her statutory rights under Title VII, and numerous other state and federal laws. Plaintiff suffered discrimination with respect to the "terms, conditions, or privileges of employment," because of her race.

19

65).        The Defendants, ratified, condoned and endorsed offensive, and pervasive discriminatory conduct and joined in that conduct. Because of it, Plaintiff lost her career, was defamed, stigmatized, and emotionally damaged, the repercussion of which was the diagnosis of a serious medical condition.

66).        Defendants and their managers knew, or should have known, that Plaintiff earned the ire of the Florida Bar, an organization in which she is required to be a dues paying member, because, as a black woman she dared to question the ethics of a white police officer who unlawfully arrested her 13 year old daughter for conduct that is non-criminal and because she filed an ethics complaint against a white prosecutor, who is a member of the Florida Bar.

67).        Defendants and their managers knew that Plaintiff contacted the Florida Bar ethics hotline and was given permission to file the ethics complaint. As a specific consequence of filing the ethics complaint, members of the Florida Bar engaged in a long campaign of retaliation against the Plaintiff.

68).        Defendant and their managers knew that Plaintiff filed a motion for disqualification against the judge who presided as judge and jury over her daughter's juvenile case that the court had no jurisdiction to hear or carry out criminal proceedings against Plaintiff and her child. Some EXAMWORKS managers are lawyers and others sophisticated business managers. They knew, or should have known, that by operation of Plaintiff's clearly established rights and the law, the judge's seven page disqualification ORDER could not lawfully be used against Plaintiff to impose penal sanctions, deprive her of her property interest in her law license or to interfere with her employment.

69).        Defendant and their managers knew that Plaintiff earned the ire of the Florida Bar because she complained about disparate treatment and racial animus in the manner in which she was treated as a black member of the Florida Bar as compared to white members who intentionally, deliberately and continuously violated the RRTFB but were never investigated nor disciplined.

70).        Defendant and their managers knew, or should have known, that every complaint

20

Plaintiff made against any member of the Florida Bar was done only after Plaintiff followed procedures established by the Florida Bar for an attorney to avoid disciplinary pitfalls. Specifically, Plaintiff contacted the Florida Bar Ethics Hotline to ensure that she was acting objectively, reasonably, and ethically. She followed the advice of the Florida Bar Staff Counsel and its Chief Regulation Lawyer. White members who have followed advice from the Florida Bar Ethics Hotline are able to use that fact as a shield against any prosecution for alleged misconduct, but the same standard was not applied the Plaintiff, who is black.

71). Next, the Defendants and their managers knew, or should have known, that the Florida Bar took exception and admonished Plaintiff because she maintained that her daughter was unlawfully arrested based on binding legal precedent; and because she sued to vindicate her child's rights.

72). The Defendants and their managers took absolutely no meaningful corrective action to investigate the hearsay within hearsay statements of misconduct allegedly made by white members of the Florida Bar. Hearsay, even in formal judicial decisions may result in a "serious danger of unfair prejudice" and are usually excluded. See *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir 1993). Here, without any meaningful review, the Defendants' managers who are lawyers or are represented by lawyers ignored or purposely failed to follow rules of their profession. At the very least, their actions were reckless and indifferent. The public records on which EXAMWORKS managers claim to have relied show an egregious pattern and practice of abuse of power, retaliation, impermissible racial statements, and an impermissible prosecution lacking probable cause. EXAMWORKS terminated Plaintiff for misconduct without setting forth a single incidence of misconduct involving Plaintiff's performance while employed with EXAMWORKS.

73). EXAMWORKS actions are consistent with the same institutionalized racial stereotypes that is proscribed by Title VII. EXAMWORKS conduct is emblematic of a well-documented racial stereotype that Plaintiff, a black female, is not allowed to complain without the

21

consequences of penal sanctions.

74).        There is corroborating evidence that the essential elements of a retaliation claim and an engineered prosecution in violation of clearly established rights are met:

   A.    protected activity -- opposition to discrimination or participation in the statutory complaint process;

   B.    adverse action;

   C.    causal connection between the protected activity and the adverse action.

75).        As a direct, natural, proximate and foreseeable result of the actions and inactions of EXAMWORKS, and its managers, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

76).        The actions of the Defendants were so malicious and in such reckless indifference to Plaintiff's federal and state protected rights as to entitle her to receive an award of punitive damages to punish Defendants and to deter them, and others, from such conduct in the future.

WHEREFORE, Plaintiff prays that this court will:

   A.  Issue a declaratory judgment that Defendants practices toward Plaintiff violate her rights under Title VII.

   B.  Enjoin Defendants, by and through its agents and employees, from continuing or maintaining the policy, practice, or custom of denying, abridging, withholding, or conditioning the rights of employees on the basis of their race, rights against which behavior are secured by Title VII.

   C.  Enter a judgment for Plaintiff and against Defendants for damages, including compensatory and punitive damages.

   D.  Grant Plaintiff her costs and a reasonable award of attorney's fees.

### COUNT II:  TITLE VII RETALIATION CLAIM
### ALL DEFENDANTS

77).        Plaintiff re-alleges and incorporates by reference as if fully set forth, the allegations in paragraphs 1 through 60.

78).        Plaintiff has been a dedicated high performing employee who consistently contributed value to EXAMWORKS and its predecessor company Gould & Lamb LLC. Without any evidentiary support whatsoever, the Defendants' statements to the EEOC indicate that it joined forces with third parties, and based solely on hearsay allegations excoriated and penalized Plaintiff for lawful protected activities.

79).        The Defendants' on several occasions, admitted that Plaintiff was terminated after she made a request for a qualified leave of absence and which PATMORE and WHITTLE resented.

80).        Specifically Plaintiff is informed and believes and on that basis alleges that Plaintiff's challenge to losing her health insurance benefits while traveling on company business offended PATMORE and WHITTLE.

81).        EXAMWORKS acted in deliberate indifference to Plaintiff's rights to be free from discrimination, and allegedly based its decisions on the unfounded hearsay allegations outlined in the Florida Bar twenty page Complaint and the Report of the Referee which contain numerous references to Plaintiff's and her child's race – black; and clearly show that the Florida Bar actions were strictly motivated by her lawful protected activities as more specifically set-forth, *supra* at ¶ 44 (1-3).

82).        No member of the public or any public official for that matter have ever filed any complaints of unprofessional conduct against Plaintiff. But for the complaints Plaintiff filed against state officials for violating her rights and her child's rights, Plaintiff would never have had any disciplinary history with the Florida Bar. It is quite obvious, even to a novice, that Plaintiff suffered adverse tangible employment action after she complained and opposed an employment practice made illegal by Title VII. The reasons cited by EXAMWORKS, to justify its adverse decisions are unlawful. EXAMWORKS and its managers viewed the Florida Bar's members fabricated evidence, lies, and an engineered prosecution without probable cause, as an opportunity to pile on and retaliate.

83).        The conduct of the Defendants deprived Plaintiff of her statutory rights under Title VII, i.e., Plaintiff suffered discrimination with respect to the "terms, conditions, or privileges of

23

employment," because of her opposition to an employment practice made illegal by Title VII.

84).        As a direct, natural, proximate and foreseeable result of the actions of the Defendants,

Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience,

mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

85).        WHEREFORE, Plaintiff prays that this court will:

    A. Issue a declaratory judgment that Defendants' practices toward Plaintiff
       violate her rights under Title VII.

    B. Enjoin Defendants, by and through its agents and employees, from continuing
       or maintaining the policy, practice, or custom of denying, abridging,
       withholding, or conditioning the rights of employees on the basis of their race
       and gender, rights against which behavior are secured by Title VII.

    C. Enter a judgment for Plaintiff and against Defendants for damages, including
       compensatory and punitive damages;

    D. Grant Plaintiff her costs and reasonable award of attorney's fees pursuant to
       Title VII.

### COUNT III:  DEFAMATION OF CHARACTER/HARASSMENT
### ALL DEFENDANTS

86).        Plaintiff re-alleges and incorporates by reference as if fully set forth herein, the

allegations in paragraphs 1 through 60.

87).        The Defendants and its managers published numerous false and malicious statements

to third parties that it knew were not true.   These statements were tainted with racial, gender, age and

retaliation overtones and were made without any support for their veracity.

88).        EXAMWORKS acted with callous indifference to Plaintiff's rights, and colluded

with a third party mandatory membership organization to intentionally deprive Plaintiff of her rights.

Florida Statute § 38.10 and Fla. R. Jud. Admin. 2.330 (f), and a plethora of legal precedents proscribe

the use of 7 page Disqualification Order against Plaintiff. The Disqualification Order is not a lawful

predicate to file charges against Plaintiff without probable cause.  Nonetheless, EXAMWORKS has

repeatedly admitted that its managers used the illegal Disqualification Order and the Report of the

24

Referee that were prepared by other members of the Florida Bar, to engage in impermissible harassment intended to globally defame and damage Plaintiff's personal character and professional reputation. Not only did the EXAMWORKS use hearsay or double hearsay by others but used hearsay from government agency and private organization hearings where the Referee and Prosecutor "*knowingly*" violated rules and law. Sample of the statements published by EXAMWORKS include but are not limited to:

    A.   *"Henry falsely testified under Oath;"*

    B.   *Henry, in her motion to disqualify the judge made numerous statements that disparaged the integrity and motivations of the judge;"*

    C.   *"In her motion to disqualify the trial judge, Ms. Henry "deliberately and knowingly made a misrepresentation by omission;"*

    D.   *"Henry made misrepresentations during her child's juvenile court proceedings   regarding her conversations with her child's probation officer;"*

    E.   *"Henry fully failed to acknowledge and/or show any appreciation for the seriousness of the unethical conduct she engaged in throughout the juvenile proceeding, the civil proceeding; and/or the bar proceeding."*

    F.   *"Henry misrepresented the plain language contained in the speedy trial rules, she misrepresented by omission, the date on which she learned of the trial judge's involvement in her civil case, she misrepresented the conduct of the appellate court in the Petition for Writ of Habeas Corpus filed with the Supreme Court of Florida, and was less than forthcoming in her statements to the trial court regarding her contact with her child's probation officer despite the fact she was not only and officer of the court, but was also under oath at the time of her testimony."*

89).       Defendants' acts as more particularly alleged above, constitute defamation of character and harassment. The Defendants' actions in defaming and harassing Plaintiff, culminated in a tangible employment action where Plaintiff was terminated, denied her PTO benefits, and denied sick leave. Despite Plaintiff's more than four years of exemplary service in furtherance of the Defendants' business, EXAMWORKS acted in violation of Title VII, as well as other federal or state laws to publish statements which exposed HENRY to hatred, ridicule, contempt, and injury in her

25

business and professional reputation.

90).        As a direct, natural, proximate and foreseeable result of Defendants' actions, Plaintiff

has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental

anguish, loss of enjoyment of life, and other non-pecuniary losses.

91).        Defendants' acts were with malice and a conscious disregard for Plaintiff's right

under Title VII and other federal and state laws.

WHEREFORE, Plaintiff prays that this court will:

A. Issue a declaratory judgment that Defendants' practices toward Plaintiff violate her rights under Title VII.

B. Enjoin Defendants, by and through its agents and employees, from continuing or maintaining the policy, practice, or custom of denying, abridging, withholding, or conditioning the rights of employees on the basis of their race, gender, age and disability, rights against which behavior are secured by Title VII.

C. Enter a judgment for Plaintiff and against Defendants for damages, including compensatory and punitive damages;

D. Grant Plaintiff her costs and reasonable award of attorney's fees pursuant to Title VII.

E. Ordering such additional equitable relief as is proper and just.

### COUNT V: INVASION OF PRIVACIES/HARASSMENT
### ALL DEFENDANTS

92).        Plaintiff re-alleges and incorporates by reference as if fully set forth, the allegations

in paragraphs 1 through 60.

93).        In light of the employer-employee relationship, Defendants owed a duty to Plaintiff

to exercise reasonable care to prevent intentional harm to Plaintiff on the basis race, age, gender, and

disability and to protect her privacy.   Instead, the Defendants chose to intentionally invade Plaintiff's

and her child's privacies. Under Florida law, juvenile records are not public records.  Plaintiff's child

juvenile records are confidential, exempt and protected from unlawful invasion by the Juvenile

Statute Chapter 985 *et. seq.*, and the State Constitution art. I § 23.   A right to privacy is also established in the First, Fourth, Fifth, and Ninth Amendments to the United States Constitution.

94).        Notwithstanding the statutory privacy rights, EXAMWORKS published numerous false statements regarding Plaintiff's minor child from juvenile proceedings.  Specifically, EXAMWORKS disciplined and terminated Plaintiff by making specific allegations of misconduct involving court records and records from the Florida Department of Juvenile Justice involving Plaintiff's minor child, such as those listed *supra* ¶ 88(A, D-F).

95).        EXAMWORKS managers went so far as to state that Plaintiff misled her direct supervisor WHITTLE because she did not divulge her child's juvenile records and this was a basis for misconduct.    Aside from the statutory confidential issues involving Plaintiff and her child, the juvenile matter was concluded prior to Plaintiff's employment with EXAMWORKS or its predecessor company and had absolutely no bearing on the excellent performance she provided during her tenure.

96).        The Defendants actions in invading Plaintiff's and her child's privacies and harassing Plaintiff with the invasion, culminated in a tangible employment action where Plaintiff was terminated, denied her PTO benefits, and denied sick leave.  The Defendants had the ability and opportunity to control, supervise and train its employees to prevent them from intentionally invading Plaintiff's and her child privacies and using that invasion to harass and terminate Plaintiff, but failed to do so.  Instead, the Defendants, joined in a campaign of ongoing harassment and malicious prosecution instituted by a mandatory membership organization to intentionally violate Plaintiff's and her child statutory rights.

Defendants' acts were carried out with malice and reckless disregard for Plaintiff's right under Title VII and other federal and state laws.

WHEREFORE, Plaintiff prays that this court will:

27

A. Issue a declaratory judgment that Defendants' practices toward Plaintiff are a violation of her rights under Title VII and applicable state law.

B. Enjoin Defendants, by and through its agents and employees, from continuing or maintaining the policy, practice, or custom of denying, abridging, withholding, or conditioning the rights of employees on the basis of their race, gender, age, and perceived disability, rights against which behavior are secured by Title VII.

C. Enter a judgment for Plaintiff and against Defendants for damages, including compensatory and punitive damages;

D. Grant Plaintiff her costs and reasonable award of attorney's fees pursuant to Title VII.

## COUNT VI – DISABILITY DISCRIMINATION
### ALL DEFENDANTS

97). Plaintiff re-alleges and incorporates by reference as if fully set forth, the allegations in paragraphs 1 through 60.

98). On April 10, 2015, Plaintiff began the process of taking a sick leave pursuant to the Family Medical Leave Act of 1993, 29 U.S.C. §2601 et. seq. and ADA, as amended.

99). As more fully set forth above in ¶¶ 21-25, Plaintiff discussed her medical conditions with her immediate supervisor, WHITTLE.

100). On April 23, 2015, Plaintiff was terminated and her request for FMLA was subsequently denied. The procedures and explanations provided in denying the Plaintiff's statutory rights to medical leave under the ADA, as amended, were in direct violation of the plain language of the FMLA statute. Moreover, no other employees seeking leave were ever subjected to a defense of lack of coverage because of being a "remote" employee.

101). Plaintiff is informed and believes and on that basis alleges that prior to her termination, the Defendants' employees PATMORE, WHITTLE and other unnamed employees, without any proof, joined forces with a third party mandatory membership organization in stigmatizing Plaintiff as "*mentally unfit*" to practice law.

102). Plaintiff was injured as a result of the wrongful, intentional and tortious conduct of its employees, PATMORE, WHITTLE and others.

28

103).         In light of the employer-employee relationship, Defendants had a duty to Plaintiff to exercise reasonable care in the retention of its employees and granting leave to which she was entitled.

105).         It was unreasonable for Defendants to terminate Plaintiff without undertaking its own investigation to confirm if the hearsay allegations of a third party, without any corroboration whatsoever, was true.

106).         Defendants breached its duty by, inter alia, using conjecture, hearsay, and information that was clearly a violation of law to penalize and terminate Plaintiff's employment.

107).         As a result of the Defendants' actions Plaintiff did not receive the anticipated sick leave benefits on which she was relying to provide the basic necessities of life – food, clothing, shelter, and medical expenses for herself and her family.

108).         The Defendants' actions directly and proximately caused Plaintiff to sustain severe, grievous and permanent injuries, mental pain and suffering, anguish, loss of earnings, and other damages; said injuries are either permanent or continuing in nature and Plaintiff will suffer such losses in the future.

WHEREFORE, Plaintiff prays for a judgment:

   A. For Costs of suit herein;

   B. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Marie Henry demands trial by jury for all issues so triable under federal and state law.


Respectfully submitted,


29

Dated this 2 5th day of May 2016.

**Marie L. Henry**
P. O. Box 953521
Lake Mary, FL  32801
Office No: (704) 737-1935
libertyjustice2012@gmail.com

**MARIE L. HENRY**